All right, our next case is A.W. on behalf of N.W. v. Princeton Public Schools. Numbers 20-2433 and 21-1502. And we'll hear from the appellants whenever they'd like to begin. I understand it's Mr. Slolinski who's going to be speaking first? Yes, Your Honor. Terrific. May it please the Court, Your Honor. Matthew Slolinski, Slolinski-Atkins LLP, on behalf of plaintiffs, appellants. And I would respectfully request one minute of rebuttal time on behalf of my co-counsel, Mr. Rice. Granted. Your Honors, in this case, the district court ruled as a matter of law that agreements that waive claims under the IDEA are enforceable. Counsel, you have no dispute that one can settle IDEA claims that have arisen in the past. Your sole argument is that there's a problem with prospective waivers, correct? That is correct, Your Honor. But I don't understand why we should read this agreement as prospective. When I look at the agreement, I see three paragraphs we're arguing about. Paragraph 7 is just an indemnity provision, okay? It's not providing a waiver. It's an indemnity. So we're talking about paragraphs 2 and paragraph 6 at plaintiff appendix 084 and 085 to 086. Paragraph 2 could be read broadly as all of the district's obligations under any law shall terminate. But it makes sense to read that in light of what comes later. And when we turn to 6, which is the detailed waiver provision, I see fully, completely releases the district from all claims they, and note the verb tense, have or may have accrued. Past perfect tense, not future. Accrued means it's already come into being. Against the district, we go down a long ways to the bottom of plaintiff appendix 085. And then the very bottom of that page says, or to the extent permitted by applicable law. So maybe if there's an applicable law problem with reading this as prospective, we should read it as just retrospective. So there might be claims that accrued as of this date, even if they relate to the 2018-2019 school year. And then I go to the severability clause. Severability clause, paragraph 21, says we're supposed to read this agreement as remaining in full force in effect. So why don't we just read this agreement as saying everything as of March 2018 is resolved, everything that's accrued as of that point. Then I see no reason to strike the agreement down. The reason, Your Honor, is that is not the way it was interpreted at all. And that is not the position that Princeton took in this case. But we get to exercise modified de novo review. We could read it that way. Your Honor, one could read it in a way that is ambiguous. And that relates to one of the other issues. As it relates to these paragraphs that were enforced by the district court, it was interpreted as being a prospective waiver throughout, including very early on when the issue arose. That was the dispute between the plaintiff and counsel for Princeton. Your client should be happy, though, if we read this more narrowly. Well, after several years, Your Honor, I think that would be somewhat unfair, where the position of the parties throughout, as well as the district judge, has been that these are future waivers and they do apply prospectively to terminate rights, and has been, in fact, applied in that fashion. How have they been applied to terminate rights that had not accrued as of March 2018? Well, there were continuing rights that the parent had through 2020 when the child was at the residential treatment facility. In fact, counsel had written to the court stating that there were no rights because of the March 2, 2018 agreement. So I do think it has been interpreted and it has been applied as if these were prospective waivers of rights under the IDEA. Okay. So what other issues are you handling? I don't understand how you divided up the summary. I guess your friend is handling equitable fraud and the voluntariness factors? I do the material factors. Okay. So what else are you discussing? I'm just addressing the public policy issue that these are waivers that— The only public policy I can find relates to the New Jersey Law Against Discrimination. You've got a dissent from Judge Sirica, but you don't have any actual law that says anything about any other rights. If we find the only problem with the prospective waiver is the NJLAD or maybe the anti-bullying law, why don't we just read this in light of the severability clause and in light of the past ten verbs, just not to reach whatever there's a public policy with? Do you have authority that says there's problems with waivers beyond NJLAD? Well, there are a number of cases that we cited in our briefs, Your Honor. Certainly, there was McCarthy v. NASCAR. There was the Hodjnowski decision. So there were a number of decisions that we cited in the briefs that precluded these type of prospective waivers. In fact, I would submit that there was no authority on the part of the district judge to uphold the prospective waivers. What about the Blunt case and the majority in the DR case? Yes. Well, Your Honor, as far as the majority in the DR case, in that case this court was very clear that that decision was circumscribed to the facts. It was to be verily narrow, narrowly read. And, in fact, the decision in there, the court said, that it should not be extended beyond this case. So it was very clear that that decision was not to be used and relied upon beyond the facts of that case. And the district court here, that is the only decision, in addition to the Blunt decision that Your Honor mentioned, that was relied upon by the district court. As far as the Blunt decision, the district court improvidently relied upon that decision, in my view. When you look at the decision, it is a long decision, and there are some references, I think in footnote 51, to future students. But when you look at it, you really have to look at the case that it was also discussing, which was Gaskin v. Commonwealth of Pennsylvania. And in that case, there was no waiver of future rights. The agreement there actually required future compliance with the IDEA. It required future IEPs. It required the full range of services in the future, based on peer review research, as the IDEA requires. So you're not disputing that it's appropriate, as you're coming up on the 2018-2019 school year, to strike a settlement as to what is the appropriate placement and funding, et cetera, for 2018-2019. You're not saying, are you suggesting that there's a legal problem with settling that liability before June 30, 2019? No, Your Honor. Perhaps in the DR case, essentially that's what the holding was, that you can settle if you're just talking about a cost allocation. You can settle that. It's prospective in the sense that it relates to a school year that is coming up, but that right has accrued at the time that a parent is thinking about enrolling the child in a school. That's an appropriate time to settle that claim, right? Right, Your Honor, but what they are settling at that time is what is an appropriate education based on that snapshot in time. And that is not what we are arguing here. What we're arguing here is if you're settling that, that's fine. But if you are then also going to incorporate into that prospective waivers of any rights under the IDEA, you are thereby terminating the rights of the parent. So either they didn't do that or they did that, but then the severability clause kicks that out. Well, Your Honor, throughout, the Princeton School Board argued against severability. They argued against it. They argued lots of things. People argue the earth is flat. That doesn't mean that it binds the court. Well, at no point, if that was the case, then why not when the, in fairness, the parent here did seek to reform the contract. The parent wanted a settlement. The parent was not trying to get out of the settlement. So the... Can I ask you a question along those lines? Let's assume that we agree with you. Do we unwind this whole thing? Does she have to give the money back? There's a number of cases we cited, Your Honor, in the briefs about that and the fact that she does not, is not required to give the money back. You want to read the bargain in a way to invalidate it, but hang on to the money, but get the ability to sue under it. You want to have your cake and eat it, too. No, Your Honor. As far as the past costs, there was consideration for the past costs. The child was already in school during that year. They never paid for the future year with the $45,000 for that next school year, for the 2018-2019 school year. So I wouldn't look at it that they're trying to get their cake and eat it, too, at all. Those future rights were, pursuant to that, the agreement, were terminated effective June 30th, 2019, and all of the rights into the future in Paragraph 6, the rights were terminated under the IDEA. She had essentially no right to really challenge it at that point through the due process proceedings. Okay. Paragraph 2 of the settlement agreement says, the district's sole financial and educational obligations are the financial term set in this agreement. So we could easily read that as saying, okay, they're not saying they're exempt from, you know, the anti-bullying law or discrimination obligations, as long as they have to comply, as long as this is just about wrapping up financial and educational obligations. Financial and educational, yes. But there are obligations under these other laws that you say can't be waived, and maybe they're not all financial educational. Paragraph 2 reads, it is understood that all of the district's obligations under any law, including but not limited to, the Individuals with Disabilities Education Act, Section 504, the New Jersey Law Against Discrimination, and the Americans with Disabilities Act, shall terminate on June 30th, 2019. So it does include every law. It is a broad, sweeping termination of. I see what you're saying there. Let's talk about Paragraph 21 on Appendix 89. Do you agree that there's a scrivener's error in this paragraph? Third line says, the remainder of the agreement shall be affected by such ruling and shall remain in full force and effect. Obviously, I mean, for that sentence to make any sense, it has to be the agreement shall not be affected by such a ruling and shall remain in full force and effect. Is there any other way to read that paragraph? It may be a scrivener's error, Your Honor. You don't have another reading to advance that paragraph? No. Okay. I don't. That may be a scrivener's error. Okay. I'm done. Thank you. Do you have something else? Could you just state for my benefit, what is the relief that you are exactly seeking? Your Honor, we are seeking to hold this agreement, which has waived future rights under the IDEA. I'm sorry. Did you say which has waived future rights? Waived future rights. Correct. That's what we are asking this court to hold it. That is against public policy. Against public policy? Against public policy. Certainly based on Hudgenowski, McCarthy, the NASCAR, Rodriguez, the Raymors Furniture, Vitality, Sharon Plow. There are a number of New Jersey Supreme Court decisions that hold where you have a statute that is intended for the public interest and that there are statutory obligations pursuant to that statute placed on a school board that they cannot contract away those obligations. So that is what we are asking. You are saying they cannot contract away those obligations? Contract away those obligations by way of contract. Yes, Your Honor. In the briefs, there are also a number of other public policy interests that we referenced, including the parents' patchery doctrine. All of the public policy interests are implicated here in this case. It circumvents statutory duties. It is against the public interest and the paramount purpose of the IDEA. So all of those interests are implicated here. Also, in our view, this contract invites neglect. When you look at paragraph 4, the school district said it would not provide an IEP or supervise the child's placement at the Lewis School. Counsel, your time is well over. Thank you, Your Honor. We will hear from your friend. Thank you. Thank you, and may it please the Court, I'm Jay Rice of Nagle Rice, and I'm going to talk a lot about the issue of the granting of summary judgment. I want to put it into perspective of what happened on March 2, 2018. Prior to that date, there was one settlement agreement that the Board of Education rejected, a second settlement agreement that the OAL rejected, and what A.W. thought was the agreement that was going to solve her daughter's problems, that her daughter would go to the fusion school, was thereafter and effectively discarded by the district in two ways. One, they refused to pay for the counseling fees of the fusion school, and then secondly, they wouldn't pay for the very courses that the fusion school had determined were in N.W.'s best interest. That's what A.W. faced when she walked into the OAL court on March 2, 2018. I'm sorry, Mr. Rice, I didn't hear that part. Who refused to pay? The district refused to pay both the counseling fees and, secondary, refused to pay for the very courses that the fusion school said this young child needed. And on the day that A.W. went to court, we have an AOL judge on the record telling her, this is a great settlement. I mean, this, to me, is like reading John Grisham as The Rainmaker. That's the pressure that was put on A.W. that day. Okay, Mr. Rice. Yes, sir. I think that the two substantive issues we need to address are equitable fraud and material voluntariness. As to both of them, I can't speak for my colleagues, but to my mind, a crucial issue here is, do we just focus on March 2, or do we look at all of March? Because I've gone through the e-mail traffic, and here's what I see. On March 2, your client, at least for purposes of summary judgment, doesn't know what all the terms are. Correct. If we stop just at March 2, there's a problem with summary judgment. But then, we know from October, everybody had been treating this as a period of time for rescission. Your client on the 6th says, I'm going to rescind if we can't work these things out. There's e-mail traffic between her and counsel over here, back and forth, back and forth. She wants a certain timing for payment. She winds up getting an assurance that the payment will be on that time. She wants to modify some financial terms. She's told, sorry, take it or leave it. We're not substantially amending the terms. The last two e-mails in that chain are, March 27, she's saying, sorry, Mr. Gorman's last e-mail is, for the final time, the district interprets it as precluding any further obligation to consider an out-of-district placement. The district will welcome her back, but no further placements, no alternative proposal. We're prepared to move forward with it. So her responses are, March 27, please let me know if the agreement was approved on March 20, as written per your e-mail below. And then on March 28, I understood from your e-mail below that the district was moving forward with the agreement on March 20, but I've heard back from you. Please let me know if it was approved, whether you need anything from me for the reimbursement. So at the end of March, she's not exercising her right to terminate after she's been informed of these terms, after she's had time to consult. So a bunch of the voluntariness factors look different. The equitable fraud looks different. And her statements here look very different from when she unequivocally terminated in October 2017. Why should I not hold her to that standard? Because immediately after, literally the day after the settlement is put on the record, is the day... March 3rd you're talking about. March the 3rd. Immediately after, she indicates to Mr. Gorman, let's get this clarified. I don't understand what paragraph 2 means. Okay. All right? And she also finds out that the Lewis School doesn't accept the monthly payments that she has certified. She was told. That's why she would have agreed to that in the agreement. And she doesn't understand why in paragraph 4 there's this language about disenrollment. And she raises all of those issues. And all that she gets from the district is, we will not modify, we will not change. And they say, if you want to terminate, you have a right to terminate. Right? But she doesn't after that. They say, we're not budging. And then she's busy saying, has it been approved? Can we go ahead? Well, the only thing with respect, Your Honor, the issue of whether she had or did not have a right to terminate post the settlement agreement I think is very much an issue. And I think the position of the district court was that, according to the district court, she put it on the record. She agreed to it. It was done. There was no, in the district court's view, there was no right to terminate. And that would hold to a course of dealing here where in October it had been treated as such, and she was allowed to rescind in October of 2017. But I don't see that in the record in March, that there was any particular provision or time that gave her the right to terminate. To the contrary, I think the position of the district was, it was a done deal. Mr. Gorman and your client and the judge are all treating there as being such a right. So, and yet at the end of the day, she's reaffirming she's not trying to back out. So why are we not permitted to consider that whole course of dealing? Well, but even, I think part of it, even if Your Honors consider it, we still came up when the district court considered this case where we had to look at the Matula factors and we had to find out, is this clear on the record? All right. Let's go to the Matula factors because I think that's important. And I think if we just look at March 2nd, the Matula factors look good for you, right? We had this question about whether she knew what the terms were, there's not excess consideration, was it explained enough, was there time to reflect on it? But if we look at the end of March, apart from the consideration factor, I mean she's a lawyer, the wording is clear, the email traffic says take it or leave it, we're sticking with it. She's, it's been explained enough in the course of it. She's had time, almost a month, to reflect on it. And so why should we, why do these factors favor her if we are allowed to consider that whole course of dealing? So let's look at it whether it's the beginning of March or at the end of March. Number one, is the written agreement clear and specific? It clearly is not. Number one, I agree with Your Honor that when I read it, I said that after 6-30-19 there is no perspective language that would bar her. That's not what the district believed at the time. It's not what the district believes now. So clearly in that paragraph, all right, there was clearly a lacking of clearance specificity. There's a lack of clearance specificity. It was clearly unclear, you're saying. Exactly. In paragraph four, there was never any clarity as to what it meant about being de-enrolled. And I also believe if you look at paragraph four, it says that if the child had to go back, couldn't stay at the Lewis School and came back,  but only within the district. Well, what in the world would happen to this child if she needed to be placed out of the district? It's never mentioned. It's never resolved. So that factor is clearly in our favor. Factor number two about consideration, giving, and exchange, the trial judge admitted to that. We give you two. Okay. Not an issue. The trial judge makes a big issue about she was a counsel. With all due respect, she was a mom fighting for her daughter. And the only experience that she ever had, and I know my time is up, the only experience she ever had in this area of the law was on behalf of her daughter. And did she have an adequate time to reflect? She certainly didn't have an adequate time on the day she signed the agreement. But by March 28th, she's had plenty of time. If we look as far as March 28th, she's had almost a month. Maybe. But clearly, she couldn't be held responsible to understand the terms of an agreement that right here today we don't have a complete agreement between the parties as to what those terms mean. We never did. Unless you have another question, my time is up. Yeah. Mr. Rice, could you just state what relief you believe is appropriate? Yes. In this case, at this point? This matter should be remanded back to the trial court. I certainly would have no objection to this court indicating to the trial court that there was no prospective rights under this agreement. And that would allow the trial court to determine what the relief should be in the ways of damages. And then briefly, in regard to the issue of the money that she did receive, what the case law says is that she doesn't have an obligation to immediately repay it, but that the trial court, in ultimately fashioning the final remedy, takes into that factor as a consideration and can make any determination it wants to do. And we cited that in our brief. Thank you. Thank you, counsel. Thank you. We'll hear from your adversary. Good afternoon, and may it please the court. Brett Gorman from Parker McKay on behalf of the Princeton Public Schools and Mickey Crisafulli. Today, we are here to analyze two different appeals. One is the appeal brought by the appellant, which relates to the March 2, 2018, agreement. And there's two questions within that.   And the second is, is there a valid settlement on or during March 2018, starting on the actual agreement in March 2, followed up by the judge's final decision, approving settlement subsequently. So when we analyze that, that is given a standard of review of the modified de novo review. And that's significant because there are, and as Your Honor talked about earlier in addressing Mottula, there are credibility issues of analyzing the party in front of you and determining whether or not they actually voluntarily entered into an agreement. That's the ALJ's role in the Office of Administrative Law. Their job is to voir dire the witness, determine do they understand the terms, do they understand what they're giving up, are they entering this voluntarily, are they under any prescription drugs or anything that would impact their ability to understand what's happening, and make a factual and credible determination on whether or not they voluntarily entered the agreement. And that's what happened. I mean, the settlement agreement, as the district court noted, was noted on the record two different times. And I do want to note that this is a practicing attorney that's there and is represented subsequently, that she's now representing parents in special education disputes. And previously, I don't know if this has come up, been there, but she had been represented by counsel at different points during this proceeding. It's also a party who was a part of a settlement agreement in September that was very similar to this agreement and of two settlement agreements back in 2015 that controlled the obligations of the party through the date that we met in March of 2018. So when you look at that, we have to give deference to what that AOJ saw that day and what happened. I do think Your Honor's correct. I think the email's further that she had time to consider the settlement agreement. She understood she had the right to rescind her consent, and I think she did have that right. What's the basis for that right?  I mean, the parties are operating under this assumption, but I'm also just not sure what weight to give it. I can't find a binding obligation. I mean, IDA talks about three days, but here it's four days after. So shouldn't I just be looking at March 2nd maybe to the 5th? I think, well, so the way I think the reason all the parties do that is she rescinded after we placed terms on the record in September. An administrative law judge granted her request not to have to be bound by that agreement and set the case for trial into March. So I think under the idea of contract law, you know, Princeton's a public entity. We can't, and if we're spending money, we're not allowed to be bound by an agreement until the board signs off on it, which is two, three weeks out. Right. That's what the judge said in October. It's like a plea bargain. The plea is not binding until both parties are bound by it. Exactly. So I can say, yes, I enter it, my director can, but if we're spending public money, only the Board of Education can be bound by that. So until that time, we could probably use, you know, regular contract law, offer, you know, acceptance, you know, tentative acceptance, not fully accepted until we get to the Board of Education meeting, which happened, and I think Your Honor is right. The course of conduct in those emails were clear. You know, this was a, this was a, we had just gone through this six months earlier. So when these emails were coming in asking for equitable reformation and asking for new things, district's position was, listen, we just went through this in September. It didn't work. Our position is, this is what we negotiated. This is what the ALJ saw. This is what the ALJ oversaw. We're approving this on the end of the date. And I gave her the opportunity. I mean, that was two days before the agreement when I sent that last email where I said, we're approving it as is. I gave her my interpretation of it, of how we're going to go through it, which I put in writing purposefully so she could have that. And when we got there, the emails right after the Board approved it was, where's my money? Where's the agreement? When are we going to do it? And then she took the money. That's the part that I guess is that I really struggle with here is she took public funds, waived claims, and I mean, I'm getting into the Rule 11 portion here, but then brought claims she waived like the month prior against us right away. Let me ask you a question. Did your client use the waivers to defeat a challenge to NW's 2020 IEP? Never. In fact, when the student came in, came back. So there's a little subtext here to this agreement, which is why it was written the way it was written. But the parent's intent was to move away. And I'm going to get to the public policy about why the future waivers are actually important. I'll get from the special ed litigator's perspective on that. But that was the perspective there. But when she came back, she had a $90,000 residential placement in, I believe it was Colorado, that she was involved in litigation with the districts out there in the intervening time period that she was here. And we funded it fully. And actually there was a mistake in the contract. They signed off on the contract. We even funded her airfare to go to Colorado to visit her daughter. I mean, that was the extent of the district's obligations to this person. They've given hundreds of thousands of dollars into the education of this student over the years. I'm asking you about the waivers right now. So I was asking you, I take it your answer was no, you didn't use the waivers to defeat a challenge in 2020. But does your client view the settlement as waiving all claims in perpetuity? No. Let me give a little background here. The subtext, maybe this will delve into the public policy piece about why future waivers are actually an important tool in the special ed litigator's world. And I am the only special ed litigator here. I think that's part of the reason why you're hearing certain arguments that don't actually make sense in practice in the OAL. The parent's intent was to move and to sell her house in Princeton and go away. That was her stated intent throughout this. So what she was bargaining was basically, listen, give me the full tuition at the Lewis School, which was her parentally chosen school, which we don't send students to. Is this all reflected in the record, though? Because this is all we can really go on is what's in the record. A lot of this is in the record. Yeah, because, well, in subsequent letters and subsequent briefing, a lot of this is in there. Because there's an email from the parent during this time frame that we talked about where she says to me, you know, so the reimbursement was tied to being educational documents, right? And she said, you know what? Just give me a lump sum of attendance and payment, and we would reimburse. She came back to me at one point and said, you know what? Don't put any ties to it. Just give me a lump sum payment. I'm going to use that for rent in my next locale, and you'll never see me again. Now, the significance of that, and they brought up that we didn't make payment in 1819, is because they moved away in the 1819 school year. As an operation of law, we have no obligations to a student who is not living within the jurisdiction of the Princeton public schools. And they cite the DFB Collingswood for the proposition that you do. That's a different scenario. In that case, the district, the student moved away, and there were pending comp ed claims from years prior. And the district said, well, you moved away. You can't get those. And the court said, no, for the years that you lived there, you're still entitled to that. Here, we have a settlement agreement that waived everything through the time period that she moved away. So there's nothing before her moving away, moving on. So the years she's gone, and this is in the briefing, there's no obligations at all from the Princeton public school to a student who lives in Colorado. I mean, that makes sense. And that's why the payment wasn't issued for the 1819 school year. So just so I can be really clear on my question, does your client view the settlement as waiving all claims in perpetuity, yes or no? Not all claims in perpetuity. We view it as challenging the IEPs offered by the district, which is what they bargained away. In the process. In perpetuity? We're looking at Paragraph 2. Well, everything absolutely through the end of 2019. As it relates to moving forward, I mean, the district still has obligations under the IDA to offer an IEP and go through that. And what she bargained for to get the maximum payment was that she would not challenge us in the future. Except why don't we read Paragraph 6? All claims they have or may have accrued. If they haven't accrued as of March 2018, how can they be waived? Well, so if you look at Paragraph 6, the end date here is June 30, 2019. The last date that we have pending monetary consideration is June 30, 2019. School years go from July 1 to June 30. Exactly. And so the consideration you recite in Paragraph 1 is for 2017-2018 and 2018-2019. And so any rights that have accrued, you know, in the run-up to the 2018-2019 school year are being cashed out in exchange for this $45,000. Not to exceed $45,000. Exactly. That's the bargain that we did there. The other piece is in there. I don't think it waives every single right that they have. I don't think that's enforceable. We never interpreted it that way. I mean, we consistently provided an IEP and paid hundreds of thousands of dollars subsequent to this agreement when she returned to educate the student. It's never been interpreted that way. It's never been attacked that way. There's never been a proceeding where it was. And the important piece to this that we've got to keep in mind is this complaint is squarely within Paragraph 6. That's why this complaint isn't rational. That's why the complaint, I think, even if you look at the future waivers and you say, you know what, I don't think the future waivers are applicable, it doesn't impact the final result here, which is the complaint is dismissed and we're done and the settlement is valid. As Your Honor pointed out in Paragraph 21, if you invalidate part of the agreement, that doesn't invalidate the entire agreement. And I also don't think that's the result they want. I don't think this party got it. I don't see a scenario, and I put this in the brief, I know they disagree, where she keeps the money and then she still gets the citizens in federal court and the settlement agreement is invalidated, right? Because what would happen? If you invalidate the settlement agreement, then the issue of appropriateness for 17 and 18 school year onward is back in the OAL. I heard you say before that she said if she gets what she wants, she's not going to challenge you in the future. Was that what you had said? Well, it was that she was. So let me give a little background. The concept was I think she knew she was moving. And she moved. She did move. There's a change of circumstance that if there was a subsequent challenge, we could get into. But that's not where we are here today. Where she moved to? I'm sorry? May I ask, where did she move to? Colorado. Is she there now? Well, she came back to the district. The student graduated from Princeton Public Schools this last June. And now she's back in Colorado to this day, as of this day. So yes, she has subsequently moved back to Colorado. Does that affect what she's entitled to in terms of education for her child? Well, moving, yes. So our obligations as the local educational authority under the IDEA, and really any law that applies to public schools is actually residing within a public school district. So I don't want to bore you with the morass of school laws, specific laws that would adjudicate this. But, yeah, if she moves out, we don't have anything to do. That's the next district's obligations to do, which was triggered. And I don't know how the case got resolved, but she was in another locale for a number of years, I believe two years, during the pendency here. Just one thing I would like to point out in terms of these, because this is a public policy issue in terms of these future waivers. They're important for special ed litigation, and I'll explain why. They're happening literally right now, just by way of example. We have a student who's going to be a junior next year, and the parents want an out-of-district placement. And, you know, so it's a seasoned special ed attorney on the other side, and we've done this a number of cases. She said to me, we want this place, and we're saying no. We're, you know, haggling over money. She says, listen, give us the two years. We'll give you a sunset clause at the end of it. We'll waive the following years. You fund it. You get certainty. That is actually likely to, I'm not going to, I don't know where it's ultimately going to go, but that's the type of settlements we do, because there's a lot of circumstances that take place. And the benefit there is, of doing that settlement that way, is the parents can get certainty on the amount, on full funding of an out-of-district placement, or greater funding. We get certainty on the budgetary end, because with state put, you know, if we agree through a settlement agreement to place a student in an out-of-district placement, they invoke state, they challenge the IEP in two years for, let's say it's an exit IEP, we're saying we're done, we're graduating. They challenge it. That placement could continue through the state put provision. So there's no end for school districts. That's why we're less likely to enter into settlement agreements if we don't have that. And that's a very important piece, because this type of litigation is very hard on families. It's very hard on schools. It shouldn't happen very often. I do it. I've seen it. It should not happen. That's why the case law and the public policy is firmly on the side of embracing settlements. And if you take future waivers away from this, the district's response is, well, we can't agree with it, because we don't know where it's going to end. And number two, we'll say to the parent, you've got to contribute. You've got to contribute toward the cost of the out-of-district placement. They don't have a lot of money. It's a forceful argument, but we don't need to resolve that here, right? I agree. I think paragraph six controls this. I don't think that they clearly waived the amended complaint through the settlement agreement. They got the benefit of it. They got full placement of an out-of-district placement that we don't want to send a student to. The parentally placed, chosen placement, they got the full funding for. That's why they made reference to the ALJ saying it's a good deal, because that's what she would have gotten if she won. She would have had to go through a whole hearing with us, get experts, put her child through all this, put herself through all this, and at the end of the day, what does she get? Full funding at the Lewis School. There's no other relief. She had already waived all the comp ed. So that's why the ALJ was like, made that comment on the record. And frankly, I don't think it's in their interest to blow this settlement up, to invalidate this settlement because of that. And I agree. I'm making a larger point here because we got into the larger point. But I think we can make a very limited decision saying paragraph six controls, you waived the claims, you got the consideration for the time period, then you moved out of district, wait when the district lost all obligations, you're done. What do you want to say about voluntariness? I do think there's voluntariness. Sure. There are arguments you could make. As of March 2nd, you know, she's not aware, at least for summary judgment purposes, she's not aware of everything that's in there. She doesn't have it. The document varies. What do we make of that? Well, I think the court needs to look at what the ALJ did to decide, hey, you know, what did the ALJ see in front of them to determine voluntariness? Because we put these settlements on the record at the OAL every day. Every Thursday is settlement day. They have experience doing this. And they know a fair settlement. They know a parent who's not doing it. It happens every day where it's not clear if a parent wants it and they back out. Give you a little extra time to talk about your cross appeal. We gave you an aside. Yeah, and I don't want to belabor that point. I mean, our main remedy is dismissal. That's really what I'm here to advocate for. From your standpoint, there is nothing else for which she's entitled to. With how the settlement played out, getting full relief under the IDA and in exchange making the waiver through June 30, 2018, then moving away for 2018, 2019, all the allegations, everything in her complaint has been waived or is not applicable to the school district as an operation of law under that piece. So, yes, I think that's absolutely correct. There is nothing for it. What disposition would you be asking for? I mean, if a district court's decision to be affirmed, I think this complaint should be dismissed with prejudice and this case should end. Which, if you want me to get into the cross appeal portion. We gave the other side some extra time. We'll do that for you, too. Okay. If you want to talk about your cross appeal. Yeah, I mean, listen, I don't think this litigation was rational. I don't. I think there was a lot of, I mean, the district court called it tortured readings of the agreements. I think that's what we dealt with. We're dealing with an abuse of discretion review here, right? Absolutely. Abuse of discretion, absolutely, Judge, for Rule 11 motion. And I get what the district court did in that case. I mean, I really do. I mean, I think they found the Rule 11 was triggered. I just think they didn't want to sanction, you know, the specific part. I think the district judge said he was troubled, but he didn't say it was frivolous. I think he made pains to try to find, come to that conclusion. I mean, if you look at some of the things that happened here. Yeah, he said he was troubled by it, tortured readings of the agreement. He called it a close question. I mean, that in and of itself is troubling in general. But then if you look at some of the conduct that happened in front of the district court judge, which we raised in the Rule 11 piece, the 24-page reconsideration brief on the order from the court saying, certify that the record is complete. Normally in special ed, that's never a litigation, a big issue. That became a long, drawn-out piece, and then they fought a 24-page motion for reconsideration. I think the strategy was, we're going to bleed the Princeton Public School dry. I think that's the strategy. Otherwise, that brief is not rational. I don't see the rationale. I think the district court made pains that went out of his way. Very generously to review that. And, you know, the district court, putting that aside, but I think that's a bit of a telling piece here. And if you look at this, we went through a pandemic, went through years of litigation on a case where the district made a payment of around $43,000, full placement costs for the disabled kid, which is the full relief. And we went through five years of litigation on this after we did a settlement agreement. Yeah, I think that, I do think that does potentially, I think that triggers Rule 11. I think that's why we're there. I'm not asking for full sanctions. I'm not asking for the world. You know, but I think, you know, a message to be sent just for the future to be like, there is a line that any litigant has to go on, even under an IDEA cases. I think that's appropriate. So, and I don't want to belabor that point. But the last thing I'll say in terms of public policy is the, you know, if we have parties that can just get out of settlement agreements, you know, take the money, get out and sue us, I think that's troubling for the state of special ed litigation moving forward. I don't, as a school district attorney, I'll be worried about what's going to happen next. You know what I mean? Because if they have this case to say, look, an AW, they didn't totally know, so they took the money and they sued you anyway, and they got the third circuit and got overturned, I think that would be a troubling precedent. Thank you, counsel. All right, we'll hear the rebuttal. I guess it's going to be a quick rebuttal. Yes, it's going to be very quick. First, speaking to Your Honor's concern, if Your Honor looks at pages 9 to 12 of our reply brief, that covers all the correspondence that occurred post the March 2nd summary judgment hearing. And in AW's very last email before the board voted, she specifically asked for clarification, and she indicated that if you don't clarify, she's going to have to contact the judge to ensure that the agreements align with the representations made at the time of the agreement. And then later, literally, on the day that the defendants asked that the agreement be approved, to which she objected, she filed her request for equitable right reformation on April the 3rd, immediately thereafter. So I think if you look at it in context, she was preserving her rights. And quickly, in regard to this cross-motion, had the ---- It files for reformation, but she doesn't ask for rescission. No, but she asks for reformation. She wants the agreement to be as it was represented to her in March, that this is what the agreement was going to say. That's all she asked for. That's all she asked for in all her emails through the month of March. And had the district done that in good faith, I mean, in regard to ferality, we wouldn't be here today. All they had to do was respond and say, let's clarify the language in paragraph 2, let's clarify it in paragraph 4, so we're all on the same page. And had that been done, we wouldn't be here today. And certainly in aid of us protecting her rights by filing the suit, it's all because not of her actions, but the actions of the district of not responding to those requests. Thank you. Okay. Thank you, counsel. We'll take the case under advisement. Thank counsel for their excellent briefing and arguments today. And we wish you good health and be well. Thank you. And if the court prior would adjourn court. Thank you.